## Morchik v New York Community Hosp. of Brooklyn, Inc.

2025 NY Slip Op 30049(U)

January 7, 2025

Supreme Court, Kings County

Docket Number: Index No. 500335/2021

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

**At an IAS Term, Part MMESP-7 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 7th day of January 2025.**

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF KINGS

---------------------------------------------------------------X

TATYANA MORCHIK, as Administratrix of the Estate of LUCY KOFMAN, and TATYANA MORCHIK, Individually,

        Plaintiffs,

  -against-


THE NEW YORK COMMUNITY HOSPITAL OF BROOKLYN, INC. d/b/a NEW YORK COMMUNITY HOSPITAL, NYC HEALTH & HOSPITALS/CONEY ISLAND HOSPITAL, NEW YORK CITY HEALTH & HOSPITALS CORPORATION and SHORE VIEW ACQUISITION I, LLC d/b/a SHORE VIEW NURSING AND REHABILITATION CENTER,

      Defendants.

---------------------------------------------------------------X

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

**DECISION & ORDER**

Index No. 500335/2021
Mo. Seq. 2


Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u> 41 – 42, 43 – 52, 55 – 56, 57, 58 – 61

     Defendant New York City Health and Hospitals Corporation ("NYCHHC") also s/h/a

NYC Health & Hospitals/Coney Island Hospital, moves (Seq. No. 2) for an Order, pursuant to

1

[* 1]

CPLR 3212, granting summary judgment to the movants and dismissing Plaintiff's Complaint against them. Plaintiff opposes the motion.

Plaintiff commenced this action as administrator of the estate of Lucy Kofman ("Decedent") on January 6, 2021, asserting claims of medical malpractice, negligent hiring/training/supervision[1], and wrongful death against NYCHHC and others, in connection to the prevention and treatment of pressure ulcers.

At the time of the events at issue, Decedent was 83-84 years old and had a medical history including diabetes mellitus, hyperlipidemia, hypertension, end-stage renal disease requiring hemodialysis three times per week, deep vein thrombosis, bladder and bowel incontinence, coronary artery disease, and chronic obstructive pulmonary disease. She had recently been treated for seizure, hematoma, and bilateral heel ulcers with left foot gangrene at New York Community Hospital from November 3-7, 2018.

Decedent was admitted to Coney Island Hospital on November 9, 2018. She had an unstageable/necrotic left heel ulcer on admission. On November 22, 2018, she was first noted to have a stage II pressure ulcer on the coccyx measuring 1 x 0.8 x 0.1 cm. She received wound care interventions, nutritional assessments, and infectious disease consults during this time. On December 7, her coccyx pressure ulcer decreased to stage I and was noted as healed on December 14. A podiatric x-ray of the left foot showed no signs of osteomyelitis. She was discharged to Shore View Nursing and Rehabilitation on December 17, 2018. On admission to

---

[1] In their opposition to this motion, Plaintiff's counsel affirmed that all claims of negligent hiring, training, or supervision against NYCHHC/Coney Island Hospital are withdrawn.

2

[* 2]

Shore View, she was documented to have an unstageable left heel pressure ulcer and a stage III sacral pressure ulcer.

Decedent returned to Coney Island Hospital on January 12, 2019 with fever and hypoxia and was diagnosed with pneumonia. In a wound care evaluation the following day, she was noted to have a stage III sacral pressure ulcer measuring 1.5 cm x 2 cm x 0.5 cm and stage III left heel pressure ulcer measuring 1.2 cm x 0.5 cm x 0.2 cm. Plaintiff-administrator (Decedent's daughter) signed a DNR/DNI form on January 21, 2019, but later reversed this status to consent to a PEG (feeding tube) placement, which was performed on February 19. Decedent underwent a surgical debridement of the sacral pressure ulcer on February 17 and an aseptic excisional debridement of the left heel ulcer on February 20. She then underwent an additional laser debridement of the sacral ulcer on February 28.

Decedent was discharged to Sea Crest Nursing on March 11, but was readmitted to Coney Island Hospital on March 14 with septic shock, acute kidney injury, and tachycardia. Her sacral pressure ulcer was noted to be stage IV, necrotic, and foul-smelling, measuring 8 cm x 7 cm x 2.5 cm on March 15. She underwent a left heel ulcer debridement and laser debridement of the sacral ulcer. There was also a right heel deep tissue injury measured on March 15, and bone exposure observed on the sacral wound on March 22. A wound VAC was placed on the sacrum on March 22 and removed on April 7. She was discharged to Sea Crest Nursing on April 11, 2019.

Decedent's last admission to Coney Island Hospital was from April 22 through May 10, 2019. She was admitted with sepsis and fever, and her stage IV sacral ulcer was infected to the bone. A bedside debridement was performed on April 27, and an infectious disease consult

3

assessed the infected wound on April 28 and recommended continuing antibiotics and surgery. An excisional debridement was performed on April 29 and another bedside debridement on May 8. Decedent was deemed stable for discharge but then developed hypotension, hypoxemia, and hypoglycemia. With the consent of family, she was given comfort care and passed away on May 10, 2019.

Plaintiff alleges that NYCHHC physicians and staff departed from good and accepted medical standards in preventing and treating Decedent's pressure ulcers during her admissions at Coney Island Hospital. Plaintiff further alleges that these departures were the proximate cause of Decedent's alleged injuries, including the worsening of her pressure ulcers, infection, malnutrition, and pain and suffering.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

> "The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or

4

[* 4]

unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].

An expert opinion need not be provided by a specialist, but the expert must demonstrate that they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (*DiLorenzo v Zaso,* 148 AD3d 1111, 1112-1113 [2d Dept 2017]). The Second Department has held that while a registered nurse is qualified to render an opinion on departures from the standard of nursing care, they are not qualified to offer a medical opinion on whether those departures proximately caused the patient's injuries (*see Zak v Brookhaven Mem. Hosp. Med. Ctr.,* 54 AD3d 852, 853 [2d Dept 2008]). A nurse also may not render an opinion with respect to the decisions and treatment of a physician beyond the scope of their nursing expertise (*see Boltyansky v New York Community Hosp.,* 175 AD3d 1478, 1479 [2d Dept 2019]; *Novick v South Nassau Communities Hosp.,* 136 AD3d 999, 1001 [2d Dept 2016])).

In support of the motion, Defendant NYCHHC submits an expert affirmation from Lawerence Diamond, M.D. ("Dr. Diamond"), a licensed physician certified in geriatric medicine. Dr. Diamond has laid a proper foundation to opine on the standard of care for the treatment in this case, as well as proximate causation as it pertains to a geriatric patient with multiple comorbidities. Defendant also submits relevant medical records and deposition transcripts[2].

---

[2] Plaintiff notes in their opposition that Defendants failed to annex a Statement of Material Facts as a separate, numbered document in compliance with Uniform Court Rules 202.8-g. However, it is in the discretion of the Court whether to order compliance, deny the motion without prejudice to renewal, or disregard this non-fatal defect. As the movants have set forth the material facts with citations to evidence in their attorney affirmation and expert affirmations, and Plaintiff has responded accordingly, the Court shall consider the motion on its merits.

5

[* 5]

Dr. Diamond opines that all treatment and care rendered to Decedent on the dates at issue was within good and accepted medical standards. During her November-December 2018 hospitalization, he notes that Decedent had an existing dried necrotic lesion on her left heel on admission, and that pressure ulcer had been present since 2015 according to her medical records. Dr. Diamond opines that this pressure ulcer was timely and appropriately treated and debrided, and the necrosis was removed. He further opines that NYCHHC followed the standard of care for prevention of additional pressure ulcers due to her high-risk status, implementing bilateral heel protectors, daily dressing changes, wound care consultations and monitoring, nutritional assessments, and turning and repositioning every two hours. Dr. Diamond also opines that a podiatry consult recommended debridement of the left heel ulcer, which was timely ordered and performed.

Dr. Diamond opines that when a new stage II sacral pressure ulcer was discovered on the coccyx November 22, further interventions, gauze, and antiseptics were applied in accordance with the standard of care, and timely wound care consultations and nutritional assessments were obtained. He notes that this pressure injury was documented to be intact and improved by December 14, 2018, and that her left heel ulcer showed no signs of infection following the debridement.

During Decedent's next admission at Coney Island Hospital from January 12 – March 11, 2019, Dr. Diamond opines that her stage III sacral pressure ulcer and stage III left heel ulcer were appropriately assessed, treated, and prevented from further breakdown. He notes that her health was further compromised at this time by pneumonia with incidental findings of nodules on her liver and spleen, "indicating her decreasing health," and there were discussions of DNR/DNI and

6

hospice care with her family. Dr. Diamond opines that the physicians and staff "timely ordered and carried out" all necessary interventions in accordance with the standard of care, including turning and repositioning every two hours, applying Santyl, and obtaining wound care and nutritional assessments. He opines that timely debridement of the left heel ulcer was performed on February 16 and February 20. He also notes that a surgical debridement of the sacral ulcer was recommended on February 24, but because of Decedent's condition and a delay in obtaining consent from her health proxy for an invasive procedure involving sedation, the laser debridement was ultimately performed on February 27. Dr. Diamond opines this was not a departure from the standard of care.

During her March 14 – April 11, 2019 hospitalization, Dr. Diamond notes again that Decedent "was DNR/DNI and in the end stage of life." He opines that there was no departure from the standard of care in treating her sacral pressure ulcer (which was now larger and had signs of infection), the left heel pressure ulcer, and a new right heel pressure ulcer which was first observed upon her March 14 admission. He opines that upon admission, Decedent was appropriately assessed as being too high-risk for bleeding to undergo a debridement of the sacral pressure ulcer, and it was in accordance with good and accepted medical standards to perform a partial bedside debridement on March 16 and laser debridement on March 18. He further opines that the left heel debridement on March 15 and April 9 were timely and properly performed. He also opines that a wound VAC was appropriately applied on March 22 to drain the sacral ulcer.

Finally, Dr. Diamond opines that there was no departure from the standard of care in treating Decedent's pressure ulcers during her April 22 – May 10, 2019 hospitalization. He states that her chart comprehensively documents "consistent turning and positioning, wound care

7

[* 7]

consultations, nutritional assessments, and daily progress notes." He opines that a timely bedside debridement was conducted on April 27, a surgical debridement on April 29, and a bedside debridement on May 8. He also opines that she was "closely followed" by infectious disease consults, and the infection in her sacral area was treated with Ceftaroline, collagenase dressings, and medical grade honey.

On the issue of proximate causation, Dr. Diamond opines that no departures from the standard of care on the part of NYCHHC employees were a proximate cause of Decedent's claimed injuries, including the development of the sacral/coccyx pressure ulcer during her first admission, the deterioration of her sacral and heel pressure ulcers, infection, sepsis, malnutrition, or death. Rather, he opines that despite appropriate treatment, her "skin breakdown and pressure ulcers were exacerbated by her long-standing comorbidities."

Dr. Diamond opines in detail that the physical changes of her advanced age, immobility, and chronic conditions including coronary artery disease, dialysis, anemia, pulmonary disease, and incontinence made her more susceptible to skin breakdown and prevented healing, noting that "her skin was thinner, less elastic, drier, less sensitive and had less circulation and less subcutaneous padding," and she had multiple end-of-life conditions that compromised her blood flow and oxygenation. Dr. Diamond further opines that on April 22, 2019, Decedent presented to Coney Island Hospital with an active infection and septic shock, which he opines is "common in patients with declining health" and did not develop due to any departures from the standard of care from the NYCHHC physicians or staff. On the deterioration of her existing pressure ulcers and her eventual death, he opines that "no intervention could have been performed to cause a different outcome."

8

Additionally, the movants submit an expert affirmation from Valrose Green-Colon, R.N. ("RN Green-Colon"), a registered nurse and certified wound care nurse. RN Green-Colon has established the relevant experience and education to render opinions only as to the standard of care for nursing staff. However, she lacks the qualifications to opine as to the wound care, debridement, and PEG placement decisions that were directed by Decedent's physicians, nor is she qualified to opine as to proximate causation of Decedent's injuries.

To the extent that RN Green-Colon renders opinions as to the care of NYCHHC nursing staff, she opines that the nursing staff appropriately assessed Decedent as high-risk on the Braden scale throughout her admissions, and properly implemented a wound care plan including a turning and repositioning protocol every two hours, hourly visual checks, daily cleansing and dressing changes, and pressure relief devices such as heel protectors and wedges. Additionally, she opines that the nursing staff "provided support for all activities of daily living, monitored vital signs, and administered medications and local treatments as per physician orders" in accordance with the standard of care.

RN Green-Colon also opines that the charting and documentation of Decedent's wound care complied with the standard of care. She notes that there was "daily documentation that [Decedent] was turned and positioned every two hours, visual checks were done every hour, daily dressing changes were done, and wound care evaluations were provided on both a daily and weekly basis by the appropriate personnel."

Based on the expert submissions, the movants have met their prima facie burden by establishing the treatment and care provided to Decedent was within good and accepted medical standards during all the subject hospital admissions. Further, Dr. Diamond establishes prima facie

9

[* 9]

that Decedent's skin breakdown, infection, and death were not proximately caused by any departure from the standard of care but were an unavoidable result of her overall decline in health, and there were no interventions that could have been undertaken to change her outcome. The burden therefore shifts to Plaintiff to raise an issue of fact.

The movants have also established prima facie entitlement to summary judgment on the wrongful death claim, as an essential element of that claim is that the party's death was proximately caused by the acts or omissions of the defendant. Dr. Diamond's expert affirmation establishes there was no underlying malpractice which caused Decedent's death. Additionally, NYCHHC moves to dismiss the wrongful death claim on the basis that Plaintiff failed to comply with Unconsolidated Laws § 7401 (1) and Gen. Mun. Law § 50-e. The Notice of Claim served on NYCHHC as a prerequisite to this action, dated August 2, 2019, asserted only damages for personal injuries and pain and suffering, but did not assert a claim for wrongful death as required by statute.

In opposition to the motion, Plaintiff submits an expert affirmation from a licensed physician, (name of expert redacted), certified in internal medicine and geriatric medicine. The Court was presented with a signed, unredacted copy of this affirmation for *in camera* inspection.

Plaintiff's expert opines that Coney Island Hospital physicians and staff departed from good and accepted medical standards in preventing and treating Decedent's pressure ulcers. The expert opines that Decedent was appropriately deemed high risk on the Braden Scale from the time of her first admission, but in the expert's opinion, adequate and timely measures were not undertaken to prevent their development and deterioration.

Plaintiff's expert places particular emphasis on the documentation of turning/positioning

10

[* 10]

and the monitoring of the stage and size of Decedent's pressure ulcers. The expert states that the staff failed to turn and reposition Decedent "every two hours" as required by the standard of care. Plaintiff's expert cites entries in the nursing chart from November 11 through May 5, which often document one position ("left side", "right side", or "supine"), despite also stating she was being turned every two hours. The expert opines that not documenting the turning and positioning schedule more thoroughly was a departure from the standard of care.

The expert further opines that physicians and staff at Coney Island Hospital failed to appropriately monitor and document the stage and size of Decedent's pressure ulcers throughout her admissions. The expert notes examples of inconsistencies in the chart, including that a "right heel pressure ulcer" rather than left heel was referenced on December 14, that there were "no measurements or staging" noted at the time of her debridement on February 17 or March 15, and that her ulcers were inconsistently documented as stage III, stage IV, or unstageable. The expert further opines it was a departure from the standard of care to not accurately measure the size of her pressure ulcers, citing to inconsistencies or discrepancies in measurements recorded in her chart.

The expert also refers to some interventions in Decedent's medical chart as delayed (specifically heel booties during her November and March admissions) because they were not concurrently documented in the nursing flowsheets, though they were ordered by the wound care specialist. The expert also opines that the hospital departed from the standard of care by not obtaining a podiatry consult for her left heel ulcer until December 14, 2018, seven days after such consult was recommended by wound care. Plaintiff's expert opines that an "upgrade in support surfaces" should have been implemented on March 22, 2019, when Decedent was discovered to

11

have exposed bone on the sacral wound.

Plaintiff's expert opines that Coney Island Hospital's physicians and employees departed from the standard of care in assessing Decedent's nutritional support. The expert addresses the fact that a PEG feeding tube "had to be put on hold" multiple times during her January-February 2019 admission due to her "high risk status for any elective procedure" and the fact she experienced an infection and fever spike. However, the expert opines without detail that more should have been done to update her care plan and respond to Decedent's malnutrition risk.

On the issue of proximate causation, Plaintiff's expert opines that Decedent's "skin breakdowns and/or deterioration were caused by unrelieved pressure, rather than her clinical medical conditions." While acknowledging that her various comorbidities placed her at high risk of developing and worsening pressure ulcers, the expert states that this risk should have prompted "greater attention to her care and treatment, including but not limited to, having nursing staff turn and position her at least every two hours as detailed above, updating her treatment and care plan when noting initial sign of skin breakdown, and consistently following her care plan." The expert opines that failure to do so was a proximate cause of Decedent's development and deterioration of pressure ulcers, infection, and need for debridement.

"When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore Univ. Hosp. at Syosset*, 204 AD3d 858, 860 [2d Dept. 2022] citing *Russell v. Garafalo,* 189 A.D.3d 1100, 1102 [2d Dept. 2020]). However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise a triable issue of fact" (*Wagner v Parker*, 172 AD3d 954, 966 [2d Dept. 2019]). Expert opinions which "fail to articulate the applicable standard of care," only assert vaguely that a higher standard

12

should have been implemented, are conclusory and insufficient to raise an issue of fact (*see Nelson v Lighter,* 179 AD3d 933 [2d Dept 2020], citing *Webb v Albany Medical Center,* 151 AD3d 1435, 1437 [3d Dept 2017]).

Here, Plaintiff's expert fails to raise a genuine issue of fact to defeat the Defendant's expert submissions. Plaintiff's expert asserts that at various times Decedent's wound care and nutritional plan should have been reevaluated, updated, or further measures should have been implemented, but does not define the appropriate standard of care in any detail. The most specific departures alluded to by the expert are a failure to provide a faster initial podiatry consult for the left heel and "upgrade in support surfaces" in response to the sacral ulcer's deterioration, but the expert does not address what additional interventions or timeline of care would have been appropriate. These opinions are vague and conclusory, failing to articulate what further steps were required by the standard of care to respond to her high risk for developing and worsening pressure ulcers.

The statements of Plaintiff's experts regarding whether Decedent was properly turned and repositioned is also not supported by the record. Contrary to the expert's statements, the chart and nursing flowsheets show repeated evaluations and measurements of Decedent's pressure ulcers, despite minor fluctuations in the recorded stage and size and one provider incorrectly referring to the right heel instead of the left. The chart also consistently states that Decedent was being turned and positioned every two hours, which Plaintiff's expert affirms is the standard of care. Plaintiff's expert cites to the fact each turn and position was not documented as proof that Decedent was left in one position, but "failure to document each element of the skin care protocol does not equate to a failure to perform each element or to a cause of the ulcer itself" (*Braunstein v Maimonides Medical Center,* 161 AD3d 675 [1st Dept 2018]).

13

Finally, Plaintiff's expert is wholly insufficient at countering the opinions of Dr. Diamond as to the issue of proximate causation. The expert states only in a conclusory manner that a failure to implement additional prevention and treatment measures, as well as the failure to document treatment with more frequency, was the cause of Decedent's development and deterioration of the pressure ulcers, infection/sepsis, and need for debridement. The expert fails to counter the detailed opinions of Dr. Diamond as to the overall decline in Decedent's condition, her DNR/DNI status due to severely compromised health, and the impediments to her skin healing due to impaired circulation, oxygenation, and incontinence. Plaintiff's expert submissions have not adequately raised issues of fact as to the hospital's compliance with the standard of care through its physicians, nurses, and personnel, nor how these alleged departures in care and documentation proximately caused injury or pain and suffering to Decedent. For this reason, summary judgment on the medical malpractice cause of action must be denied.

With respect to the wrongful death claim, the Court notes that a plaintiff may not seek leave to file a late Notice of Claim beyond the statute of limitations. Plaintiff has also never cross moved or made any application to amend the Notice of Claim to assert wrongful death as a derivative claim based in the same facts. On these grounds alone, the wrongful death claim must be dismissed.

Furthermore, regardless of any defect in the Notice of Claim, Plaintiff's expert affirmation does not address Decedent's death in their proximate causation argument. "Expert testimony is necessary to prove a deviation from accepted standards of medical care *and to establish proximate cause*" (*Navarro v. Ortiz*, 203 AD3d 834, 836 [2d Dept 2022] [emphasis added], quoting *Novick v South Nassau Communities Hosp.,* 136 AD3d 999 [2d Dept 2016]).

14

The movant's expert Dr. Diamond sufficiently established that Decedent's death was the result of an overall decline in her health and failure to thrive, not proximately caused by the alleged pressure injuries attributed to NYCHHC. Plaintiff's expert submission did not counter these opinions or raise any issue of fact as to the proximate cause of her death.

Plaintiff has withdrawn their claims of negligent hiring, training, and/or supervision against NYCHHC and does not oppose the branch of the motion seeking dismissal of those claims. Accordingly, summary judgment is granted in favor of NYCHHC on all causes of action, and the Complaint is dismissed against them in its entirety.

It is hereby:

**ORDERED** that Defendant NYCHHC's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment to the movants and dismissing Plaintiff's Complaint against them, is **GRANTED;** and it is further

**ORDERED** that the caption is amended to read:

-----------------------------------------------------

TATYANA MORCHIK, as Administratrix of the Estate
of LUCY KOFMAN, and TATYANA MORCHIK, Individually,

     Plaintiffs,

 -against-

THE NEW YORK COMMUNITY HOSPITAL OF BROOKLYN,
INC. d/b/a NEW YORK COMMUNITY HOSPITAL and SHORE

[* 15]

VIEW ACQUISITION I, LLC d/b/a SHORE VIEW NURSING
AND REHABILITATION CENTER,

Defendants.

-----------------------------------------------------

The Clerk shall enter judgment in favor of NEW YORK CITY HEALTH AND

HOSPITALS CORPORATION and Coney Island Hospital, also sued herein as NYC HEALTH

& HOSPITALS/CONEY ISLAND HOSPITAL.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

16